## Kelly's Ex'r et al. v. Kelly et al.

March 14, 1941.

Charles B. Spicer and J. B. Carter for appellants.

George R. Pope and R. L. Pope for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Sarah M. Kelly, the wife of appellant, William B. Kelly, died on March 11, 1939, while residing in and a citizen of Harlan County. She was between 78 and 79 years old—her surviving husband being 4 years her senior. She left surviving her eight children and two grandchildren, whose mother was a deceased daughter (having died in April, 1936), who married one Fleenor. That daughter—according to the undisputed testimony—was a favorite child of her mother, and when she died the mother began to pine away from grief, both physically and mentally. In about a week after the death of Sarah M. Kelly, one Harve Turner turned up with and displayed a writing purporting to be the last will and testament of Sarah M. Kelly, bearing the date of January 31, 1937, nearly ten months after the death of her favorite daughter. The purported will was prepared in type and its phraseology and arrangement clearly shows that whoever prepared and composed it possessed something more than amateur knowledge of how such documents should be written. After the usual heading containing the statement of ''sound mind and memory,'' etc., it directed the payment of the debts and funeral expenses of the testatrix by her named executor, who was her surviving husband. It then gave to him all of her property for and during his natural life but without power to dispose of it. The remainder was devised to only two of her children, appellants, John Kelly and Dave Kelly, the former of whom was then forty odd years of age and the latter approaching his fortieth year. It was then recited as a reason for her discriminating and prima facie unnatural will that she had theretofore made ample provision in the way of advancements to her other children, but had not done so with her two sons, John and Davie. The paper was signed by her mark and witnessed by Harve Turner, who produced it after her death, and by his nephew, Floyd Lewis—their signatures as such appearing on the copy in the record to have been made on different dates. Immediately following, and under the signatures as witnesses, there appears on the copy contained in this record these figures: ''4-3-39'' and ''5-2-39,'' which are not explained in the record, but which would seem to indicate separate dates that the paper was signed by the witnesses, and which is more than two years after the alleged execution of the paper and after the death of testatrix. We mention such fact only for the purpose of

calling attention to many other ones of like mystification, some of which will be pointed out during the progress of this opinion.

The paper was probated before the county court of Harlan County on an ex parte application, the disinherited children and the grandchildren (children of the one who was dead) having no knowledge of it at the time. As soon as they became aware of the probate judgment, they prosecuted an appeal to the Harlan circuit court, and in their statement of appeal they denied that the probated paper was the last will and testament of the alleged testatrix, and further averred that she was unduly influenced to execute it, and did not possess sufficient mental capacity to make it. Those grounds of attack were denied; but the denial was preceded by motions and demurrers which the court overruled on the ground that none of them was well taken and with which conclusions we agree. Therefore, no space nor time will be devoted to their discussion, although counsel for appellants devote considerable space in their brief in arguing the merits of such preliminary matters and the assumed error of the court in overruling them. The jury to which the issues were submitted returned a verdict finding the paper not to be the last will and testament of the alleged testatrix, followed by a motion for a new trial by contestees, which the court overruled, and from the judgment pronounced on the verdict they prosecute this appeal.

Counsel for appellants in their brief filed in this court argue but three points: (1) That the court erred in not sustaining the special demurrer filed by appellants to the proceedings in the circuit court and in overruling their motion to dismiss the appeal; (2) in overruling their motion for a directed verdict finding the paper in contest to be the last will and testament of the testatrix, which was made at the close of the testimony of contestants, and also at the close of all the testimony, and (3) incompetent evidence offered by contestants over the objections of contestees—the first one of which we have already disposed of, leaving for consideration only grounds (2) and (3), each of which will be determined in the order named.

In support of argued ground (2) it is, of course, insisted that the testimony was insufficient to support

the finding of the jury, either that the will was procured by undue influence exercised on the alleged testatrix, or that she was mentally incapacitated to make a will at the purported date of that instrument. The testimony heard at the trial consists of three typewritten volumes aggregating 399 pages, and it follows the lines usually pursued in contests of this character, i. e., by proving or attempting to prove many trifling and detailed facts having but little, if any, remote value in solving the principal one for determination, but the general effect of which is to lay bare the past life of the one who executed the contested paper claimed to be a will, regardless of the effect of those facts on the principal inquiry involved in the case. Hence, there is brought to us all of the activities of Mrs. Kelly within a period of several years preceding her death from the threading of a needle to the sale of real estate. In the general hotch-potch of the facts, so detailed and proven, there is abundant proof that Mrs. Kelly at the time of and for sometime preceding the date of the involved paper, and from thence to the time of her death, was not only in a weak and rundown physical condition, but also that her mind was similarly impaired. She did not know her own children at times when they would visit her, nor did she know where she was, and she would insist on being carried home at a time when she was then in her home. She clipped the buttons from her garments and would substitute pins, and sometimes slashed her clothing into shreds with scissors. She continued to call for her deceased and favorite daughter, Joanna Fleenor, and wondered why she did not visit her. Many other facts were indisputably proven, not only by the contestants themselves, but also by neighbors and acquaintances who had known Mrs. Kelly for a great number of years and who had resided in her neighborhood.

Not only so, but in the fall of 1936 preceding the date of the paper in contest—and following the death of the favorite daughter—her children had some sort of meeting and discussed her mental condition with the view of taking some legal steps to prevent her dissipating her property while so mentally impaired. A paper was prepared for the children to sign, and it was proposed as a basis for some legal steps to be taken for the purpose indicated. It recited her deficiencies and impairments, and it was suggested that the statement

should be published in order to warn merchants and others not to deal with Mrs. Kelly because of her mental incapacity, and also to employ that writing as a possible foundation for some sort of legal proceedings to accomplish the desired end of preventing the dissipation of decedent's estate and to preserve it for her benefit as long as she lived and then to her heirs. The property she owned consisted mostly of real estate, and at the date of the execution of the paper she owned, unencumbered, as much as or more than one hundred acres of land which passed under her alleged will, and which was located near the town of Evarts where she lived, it being near enough to be available for building lots for citizens of that town. Its value at that time, according to the proof, was anywhere from $10,000 to $12,000.

The two favored sons in the contested paper were aware of and discussed the mental condition of their mother on the occasion referred to (in the fall of 1936), and it is proven by the testimony of contestants that at least one of them signed it, but which he denied. At any rate, the paper so drawn and signed was delivered to John Kelly with instructions from the other children to have it published in a newspaper circulated in the community, which, according to them, he promised to do, but which he never did. They also testified that they had not seen that paper since delivering it to him. But whether or not either of the favored sons signed that paper they do not deny that the question was considered and discussed by the children of Mrs. Kelly, and that at least a considerable majority of them were convinced that she had become mentally impaired to a considerable extent and which was, perhaps due to grief over the death of her favorite daughter. Furthermore, it was testified by a nurse, who also assisted in the household work in Mrs. Kelly's home, that some three months before her death her husband insisted that she make a will disposing of her property, but that she declined to do so, though not telling him at that time that she had already executed a will. That testimony, however, is denied by the husband. Many other facts equally potent in determining the issue of mental capacity were proven at the trial, and in the aggregate they were more than sufficient to require a submission of the issue to the jury and to support its verdict finding incapacity.

It is true that some witnesses—including the three devisees named in the contested paper—testified that although Mrs. Kelly was greatly grieved over the death of her favorite daughter, yet they discovered no material change in her mental condition; but they admitted that her physical condition considerably declined thereafter. So that, if there was nothing else in the case except the phases presented by the testimony we have so generally narrated, the verdict of the jury cannot be said to be flagrantly against the evidence, or against its preponderance. On the contrary, we are convinced that the proof thus far noticed preponderated in favor of the finding of the jury.

When, however, we come to consider the circumstances under which the contested paper is alleged to have been executed the conviction above expressed is most substantially confirmed. Harve Turner was not related to the decedent in any way, and was but a neighboring stranger in blood to her. He was a notary public and he says that on or about the date of the paper in contest he had a conversation with Mrs. Kelly in which she said to him that ''She was fixing up her business, that she did not expect to live long and she wanted her business all fixed up before she died.'' That she then or thereafter produced the paper stating that she had procured it to be prepared, but that she neither stated its contents nor who prepared it, nor was it read by either of them at that time. He stated that he as notary public had never officiated at the execution of that sort of document and he deferred decedent's request for him to then do so for at least ten days, after which he procured his nephew, Floyd Lewis, and went to the home of Mrs. Kelly (which would be about the 10th of February, 1937) and found her in her home entirely alone, with no one in the building whatever, and that she then produced the paper with her mark already upon it; that he and Lewis then signed their names thereto as witnesses, and that she then delivered the paper to him with instructions for him to keep it until after her death. Notwithstanding that testimony on the point of no one being present in the home at that time, it is uncontradictedly shown by other proof that during that period Mr. Kelly spent the most of his time at home, since he himself was very feeble physically, and that decedent's daughter, Mrs. Taylor, had prior to that time—

and pursuant to a request by letter—left her home in Richmond and spent some three weeks nursing and assisting her mother in looking after household affairs—also at that time a nephew of the decedent and his family were occupying another part of the building in which Mrs. Kelly lived, and likewise a nurse and household worker by the name of Hall was then staying at the Kelly home, none of whom were present on that occasion, but all of whom had left the premises with no one to look after the decedent in her enfeebled physical condition if anything happened to her—strange though it seems. Not only so, but such secrecy in the execution of the paper, and concerning its execution thereafter, are facts quite out of the ordinary. So much so as to excite grave suspicion and doubt as to the truth of the tale so told.

Furthermore, it was shown beyond controversy that the recitation in the paper of prior advancements made by Mrs. Kelly to her disinherited children was false, and that in reality advancements to her two devisees in remainder after the life estate of her husband in the property she devised were greater than that to any of her other children. Also, it will be observed that, notwithstanding the great love and affection manifested for her deceased daughter—whose only property was the little cottage in which she and her husband and children resided—her two children were given nothing by the alleged will, which itself is an inconceivable fact in the proven circumstances in the case if Mrs. Kelly was in her right mind when she is alleged to have executed her will.

It is furthermore shown that the two sons, John and Davie Kelly, sole beneficiaries in remainder of the contested will, visited the home of their mother daily, and, of course, frequently conversed with her on business and other affairs. They thus had an opportunity to either influence her to execute the will, or to have it prepared and apparently executed so as to appear to have been legally done. An additional strange and unaccountable circumstance in the case is that no draftsman was produced, and we are utterly without proof of the circumstances under which it was done, or even the place where it was done. The attorney first appearing in the contest for the contestees was one E. L. Morgan, who prepared and submitted the preliminary motions and

demurrers hereinbefore referred to, as well as the original answer to the pleading of contestants; but after that an order appears wherein he expressly withdrew from the case without any reasons assigned, and present counsel for appellants were substituted for him as their attorneys. The first counsel, so far as this record shows, was alive at the time of the trial and resided in the city of Harlan and was, therefore, accessible to the processes of the court, and we surmise that he might have furnished some enlightenment upon the totally obscured facts surrounding the preparation and possibly the execution of the will in contest. The sufficiency of the evidence heard at the trial to sustain the verdict of the jury could be more completely demonstrated were we to take time and space to set out in detail all of the testimony bearing upon that issue furnished by contestants—appellees herein—but what we have already recited is more than sufficient for that purpose and we will pursue the discussion no farther, contenting ourselves by saying that this ground is without merit.

■ The only testimony objected to as forming the basis of ground (3) is the proof that was heard with reference to the paper that was drawn up in the fall of 1936 when the children of Mrs. Kelly were discussing her mental condition and the propriety of taking steps towards preventing her dissipating her property because of her unsoundness of mind. The argument in support of that ground is, that the paper referred to should have been produced, or if lost that fact should have been proven. As a general proposition the law as contended for is correct, but in this case all of the witnesses who testified concerning the matter objected to stated that the paper was delivered to John Kelly, one of the contestees, with instructions for him to have it published as the children had agreed to, but which he never did, and that none of them had seen the paper since that time. Therefore, it was not only lost so far as contestants were concerned, but it was shown to be in the possession of their adversaries in this litigation, and if they wanted to contradict the testimony as to its contents they had but to produce the paper for that purpose. It is, therefore, clear that the objection to the indicated testimony was, in the circumstances, properly overruled, and its admittance by the court was proper and not erroneous.

At the close of all the testimony, contestants offered an amendment to their original pleading in which they denied that their mother ever executed the probated paper; but the court on objection of contestees declined to permit it to be filed. We doubt the correctness of the ruling of the court in rejecting that amendment, but since the error, if one, was committed against appellees, the winning litigants, it is not necessary that we determine the correctness of the court's ruling in rejecting that tendered pleading. However, it might be said in passing that we are very much inclined to the belief as grounded upon the unnatural circumstances proven in the case, that no such paper was ever executed by Mrs. Kelly.

Wherefore, for the reasons stated, the judgment is affirmed.